# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 5, 2011

## STATE OF TENNESSEE v. GREGORY D. DOUGLAS

**Direct Appeal from the Circuit Court for Madison County**
**No. 08-658        Donald H. Allen, Judge**

---

**No. W2010-00472-CCA-R3-CD  - Filed July 20, 2011**

---

A Madison County jury convicted the defendant, Gregory D. Douglas, of second degree murder, a Class A felony.  The trial court sentenced him as a Range I, violent offender to twenty-five years in the Tennessee Department of Correction.  On appeal, the defendant argues that the evidence was insufficient to support his conviction and that his sentence was excessive.  Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

David W. Camp, Jackson, Tennessee, for the appellant, Gregory D. Douglas.

Robert E. Cooper, Jr., Attorney General and Reporter; David Findley, Assistant Attorney General; James G. Woodall, District Attorney General; and Brian Gilliam and Matthew Floyd, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Background

On September 16, 2008, a Madison County grand jury indicted the defendant for second degree murder, a Class A felony, for the May 5, 2008, killing of James Staten.  The matter proceeded to trial on July 23, 2008.

*State's Proof.*  Jackson Police Officer Charles Trull testified that he and his partner, Lieutenant Mark Wray, responded to a shots-fired call at 209 Hardee Street in Jackson, Tennessee, on May 5, 2008, between 7:45 and 8:00 a.m.  Lieutenant Wray arrived at the

location before he did. Officer Trull testified that he began taking pictures of the scene as soon as he arrived because Lieutenant Wray was checking on the welfare of a man on the ground, and another officer was questioning a witness. Officer Trull observed that the man on the ground was alive and moving. Officer Trull observed some type of fluid in the location where a witness told him that the suspect's car had been parked. He also observed wet tire marks and a trail of fluid going west down the street. He said that there was a bullet fragment and nine millimeter casings near the victim. Officer Trull collected the bullet fragment and casings as evidence.

On cross-examination, Officer Trull testified that it took him approximately one minute to respond to the location from when he was dispatched at 7:46 a.m. He traveled north on North Royal Street to reach Hardee Street and did not meet any vehicles traveling in the opposite direction from the crime scene.

Jackson Police Lieutenant Mark Wray testified that he was the first officer to respond to a shots-fired, man down call at 209 Hardee Street. When he arrived, he observed the victim lying face down, with his body partially in the driveway and partially on the street. Lieutenant Wray said that he could tell that the victim had been shot repeatedly in the upper body. He asked the victim who had shot him, but the victim's only response was that he was having trouble breathing.

Nadia Rogers testified that in May 2008, she and her one-year-old son lived at 209 Hardee Street. The defendant spent the night of May 4 at her house and was still at the house before 7:30 a.m. Ms. Rogers did not recall what time she woke up, but she remembered getting her son ready to go to daycare sometime between 7:00 a.m. and 7:30 a.m. The defendant left the house, and she heard four shots two to three minutes later. She testified that the shots were so close that it sounded like they were coming into her house. After the shots were fired, she went outside and saw the defendant driving away. Ms. Rogers testified that the defendant was driving a brown Chevrolet car with Michigan tags. She said that she walked down the driveway and saw the victim lying halfway on the driveway and halfway on the street. She went to the victim and began speaking to him. She asked who had done this to him, and he responded that it was the defendant. Ms. Rogers had to go back inside to get a telephone to call 911 but then stayed with the victim until the police arrived. Ms. Rogers testified that she dated the victim in 2006. She said that the victim normally came to her house at 8:00 a.m. each day, Monday through Friday, to pick up her son and take him to school. Ms. Rogers said that it was unusual for the victim to be at her house as early as he was on May 5 and that she had not expected him to come at all that morning. Ms. Rogers testified that she was not dating the defendant in May 2008, but they had a good relationship and were talking about being together. She said that the defendant had fallen asleep at her house on May 4, which was why he was there the morning of May 5.

On cross-examination, Ms. Rogers agreed that she testified at the preliminary hearing that the defendant was at her house on May 5 to get a phone charger. She said that she may not have testified about his spending the night because she had been very upset at the time of the hearing. Ms. Rogers acknowledged that she told the police in her May 7, 2008, statement that the defendant came to her house after 7:30 a.m. to pick up a phone charger and then left. She said that she had not expected the victim to pick up her son for school that morning because he had told her the evening before that he had something else to do, so she planned for her mother to take her son to school. Ms. Rogers testified that her mother and her mother's boyfriend were also in the house on May 5 and could confirm that the defendant had spent the night.

Craig Holt testified that on May 5, 2008, he lived at 213 Hardee Street, which was next door to 209 Hardee Street. He said that he had just gotten out of the shower when he heard a "pop." He thought a neighbor's vehicle had backfired until he heard four more "pop[s]." He looked outside and saw a brown Chevrolet backing up and driving away. He noticed that the vehicle had blue tags, but he did not know whether the tags were from Kentucky or Michigan. Mr. Holt said that when he stepped outside, he saw the victim lying on the curb. He went to the victim and told him to be still. The victim told him that "[h]e had been shot." Mr. Holt testified that he had seen the brown Chevrolet before, but he did not know the driver. He said that he did not see the driver on May 5. Mr. Holt testified that he recognized the victim as the same person who picked up a child from 209 Hardee Street to take to daycare every morning.

On cross-examination, Mr. Holt agreed that he told the police that he had seen the brown Chevrolet parked overnight at 209 Hardee Street several times.

David Smith testified that in May 2008 he lived at 217 Hardee Street, two doors down from the crime scene. Mr. Smith testified that on the morning of May 5, 2008, he heard a sound like a truck backfiring. He did not see anything when he looked outside. He then heard three to four shots. Mr. Smith testified that he thought the noise was coming from Craig Holt's house, so he started to walk next door to investigate. As he was walking, he saw a "kind of gray color[ed]" Chevrolet backing up and driving away. He saw Ms. Rogers run outside to the victim. Mr. Smith said that at that point, he returned home and went to work.

Tennessee Bureau of Investigation Agent Cervinia Braswell, a forensic scientist with the firearms identification unit, testified that she received a Hi-Point nine millimeter pistol, five cartridge cases, and five bullets or bullet fragments in relation to this case. She said that

her testing showed that the same gun had fired all of the cartridge cases, but the gun submitted to her was not the same weapon that fired the cartridge cases.

Jackson Police Investigator Tyreece Miller testified that he took over the lead investigator position in this case in December 2008. Prior to that time, the original investigator kept him abreast of the investigation because he was her immediate supervisor. He testified that the police suspected that the defendant had shot the victim and put out a "be on the lookout" for him. On May 6, 2008, the police recovered a brown Chevrolet car with Michigan license plates that was parked behind an abandoned house on North Liberty Street. Investigator Miller photographed the vehicle and its location. He said that he did not see any tire tracks in the tall grass around the vehicle. He estimated that the vehicle had been parked for "awhile" because the weeds around the car had "a chance to stand back up." The police took custody of the car and canvassed the neighborhood to determine if the neighbors knew the defendant. In the course of the canvass, the police found a Hi-Point nine millimeter pistol located 100 to 150 yards from the vehicle inside of a tree trunk. Investigator Miller sent the pistol to the ballistics expert for testing. The police processed the vehicle for fingerprints and released it to the defendant's parents on June 3, 2008, after his mother paid for the tow bill. The police arrested the defendant on May 12, 2008.

On cross-examination, Investigator Miller clarified that the defendant turned himself in to authorities on May 12.

William L. Roane testified that he was a forensic latent fingerprint examiner for the Jackson Police Department. He compared the latent prints lifted from the brown Chevrolet vehicle to the defendant's fingerprints and palm print and found that some of the prints from the vehicle matched the defendant's while others were unidentified or did not have value for identification.

On cross-examination, Mr. Roane testified that sunlight, dew, or rain would "probably destroy [latent fingerprints on the outside of a car] right away." Under conditions where moisture could not get to the car, the fingerprints would last several days. He said that there was no way to determine the age of a print.

On re-direct examination, Mr. Roane testified that, based on a photograph of the defendant's vehicle that showed the conditions under which the police found the vehicle, the "life expectancy" of fingerprints on the outside of the vehicle "would be pretty short."

Dr. Thomas Deering, an assistant medical examiner, testified that he performed the victim's autopsy on May 6, 2008. Dr. Deering testified that the victim had four gunshot entrance wounds in his back and one gunshot entrance wound in his abdomen. He

determined that the cause of death was multiple gunshot wounds and the manner of death was homicide.

Dawn Pope, the victim's mother, testified that the victim's normal morning routine was to pick up his and Nadia Rogers' son at Ms. Rogers' house and take him to daycare.[1] He worked from 10:30 p.m. until 7:00 a.m. and would drive to Ms. Rogers' house after work.

*Defense Proof.* Meincwone Sherrelle Lee testified that her son, Tyrone Lee, was the defendant's best friend. She testified that the defendant was at her house all day on May 4, 2008. She said that the last time she saw him on May 4, 2008, was when the 10:00 p.m. news ended. When she woke up the next morning at approximately 10:00 a.m., he was not there. She did not see him with a brown Chevrolet.

Tyrone Lee testified that on May 4, 2008, the defendant was with him all day. They went to sleep at 1:00 a.m. or 2:00 a.m. on May 5, 2008, at Mr. Lee's house. He woke up at 9:00 a.m., and the defendant drove him to school in Ms. Lee's Nissan Maxima. Mr. Lee explained that his mother needed the car to go to a doctor's appointment, so the defendant drove him to school and returned the car to Ms. Lee. Mr. Lee said that the defendant's Chevrolet Caprice was parked on Liberty Street. He testified that the defendant's car was not working because something was wrong with the steering column and that he helped the defendant move it to North Liberty Street at the end of April.

Anthony Coman testified that he was the defendant's cousin. He said that the defendant called him to ask whether he could park his car at Mr. Coman's grandmother's house on North Liberty Street. The defendant told Mr. Coman that he could not drive his car because the steering wheel was not working properly. Mr. Coman said that his grandmother had moved to Kansas City, so the house was vacant.

Sherrell Douglas, the defendant's mother, testified that she bought a 1985 Chevrolet Caprice for the defendant. She recalled that the defendant told her that he was having problems with the car's steering column and that he had parked it in the back yard of a house on North Liberty Street. He also gave her the car keys. Ms. Douglas testified that the car had expired Michigan tags. She said that she did not have the money to fix the car. Ms. Douglas testified that in May 2008, she went to North Liberty Street to look for the car, but it was not there. She learned that the police had towed the vehicle. Lieutenant Miller told her that she could retrieve the car if she paid a certain amount of money. Ms. Douglas testified that when she got the car, it was difficult to start and "the steering wheel was real loose." She had the vehicle repaired and learned that the steering column had missing screws.

---

[1] The state asked Ms. Rogers whether the victim was the father of her son, and she did not answer.

Brian Holliday, Ms. Douglas's co-worker, testified that he repaired the Chevrolet for Ms. Douglas. He said that the steering wheel was loose to the point that it could easily have come off while someone was driving it.

Following the close of proof and deliberations, the jury convicted the defendant of second degree murder, a Class A felony. The trial court held a sentencing hearing on September 2, 2009, and sentenced the defendant as a Range I, violent offender to twenty-five years in the Tennessee Department of Correction. The trial court denied the defendant's motion for new trial, and the defendant filed a timely notice of appeal.

**Analysis**

I. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to support his conviction because of the conflicting testimony presented at trial. Specifically, he contends that Ms. Rogers was not credible and that the evidence showed that no one had driven the defendant's vehicle since April 2008. The state responds that the jury resolved any conflicts against the defendant, as was its prerogative.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558; *Tuggle*, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002); *Bland*, 958 S.W.2d at 659. Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *See State v. Elkins*, 102 S.W.3d 581, 582 (Tenn. 2003); *Reid*, 91 S.W.3d at 277.

A defendant may be convicted on the basis of direct or circumstantial evidence or a combination of both. *State v. Winters,* 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003); *see also State v. Pendergrass,* 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In fact, circumstantial evidence alone may be sufficient to support a conviction. *State v. Tharpe,* 726 S.W.2d 896, 899-900 (Tenn. 1987). Moreover, the state does not have the duty to exclude every other hypothesis except that of guilt. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (adopting the United States Supreme Court standard that the jury is only required to weigh evidence, whether direct or circumstantial, against the reasonable doubt standard); *see also State v. James*, 315 S.W.3d 440, 455 n. 14 (Tenn. 2010) (noting that federal courts have rejected the notion that the government has a duty to exclude every other hypothesis save that of the defendant's guilt). "Circumstantial evidence in this respect is intrinsically no different from testimonial evidence." *Holland v. United States*, 348 U.S. 121, 140 (1954). Therefore, when considering the sufficiency of evidence, we treat direct and circumstantial evidence the same.

Second degree murder is "[a] knowing killing of another." *See* Tenn. Code Ann. § 39-13-210(a)(1). A knowing act requires one to be "aware of the nature of the conduct" and "aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-302(b). "A person can act knowingly irrespective of his or her desire that the conduct or result will occur." *State v. Gray*, 960 S.W.2d 598, 604 (Tenn. Crim. App. 1997). "In second degree murder, the result of the conduct is the sole element of the offense. . . . [A] result-of-conduct crime does not require as an element that an actor engage in a specified course of conduct to accomplish the specified result." *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000).

Viewed in the light most favorable to the state, the evidence at trial showed that the defendant walked out of Ms. Rogers' house, shot the victim five times, and drove away in a brown Chevrolet Caprice with Michigan tags. While there was conflicting testimony presented about where the defendant had spent the previous night, the only evidence presented about the defendant's whereabouts at the exact time the victim was shot was that he was at 209 Hardee Street. To the extent that Meincwone and Tyrone Lee's testimonies could be construed as an alibi for the defendant for 7:30 a.m. to 8:00 a.m., during which time the victim was shot, the jury resolved the conflict between their testimonies and Ms. Rogers' testimony in favor of the state. *Bland*, 958 S.W.2d at 659. Ms. Rogers' testified that the victim told her that the defendant had shot him. Her credibility was a matter for the jury's determination and not this court's. *Id.* Several witnesses saw the brown Chevrolet Caprice with Michigan tags leaving the crime scene immediately following the gunshots. The defendant's argument that the testimony and photographic evidence proved that the defendant had not moved the vehicle since leaving at the house on North Liberty Street is without merit because that was an issue of fact for the jury. We conclude that the evidence

was sufficient for any rational trier of fact to find that the defendant knowingly killed the victim; therefore, the defendant is without relief as to this issue.

## II. Sentencing

The defendant contends that the trial court imposed an excessive sentence when it did not follow the principles of the sentencing act and overemphasized the defendant's juvenile record.

An appellate court's review of a challenged sentence is de novo on the record with a presumption the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). The Sentencing Commission Comments to this section of the statute indicate that the defendant bears the burden of establishing that the sentence is improper. When the trial court follows the statutory sentencing procedure and gives due consideration to the factors and principles relevant to sentencing, this court may not disturb the sentence. *See State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008).

Prior to 2005, the Sentencing Act set forth a "presumptive sentence" to be imposed within the applicable range: the minimum sentence for all felonies other than Class A felonies, and the midpoint sentence for Class A felonies. Tenn. Code Ann § 40-35-210(c) (2003). Pursuant to the 2005 amendments, our Sentencing Act has abandoned the statutory minimum sentence and renders enhancement and mitigating factors advisory only. *See* Tenn. Code Ann. §§ 40-35-114, -35-210(c). The 2005 amendments set forth certain "advisory sentencing guidelines" which the trial court is required to consider but is not bound by. *See id*. § 40-35-210(c). Although the application of factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors in §§ 40-35-113 and 40-35-114." *Id*. § 40-35-210(b)(5). The trial court is also required to place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, to ensure fair and consistent sentencing." *Id*. § 40-35-210(d). Once applied, the chosen enhancement factor becomes a sentencing consideration subject to review under Tennessee Code Annotated section 40-35-401(c)(2). Thus, while the court can weigh enhancement factors as it chooses, the court may only apply the factors if they are "appropriate for the offense" and "not already an essential element of the offense." *Id*. § 40-35-114. The trial court must find facts related to sentencing by a preponderance of the evidence rather than beyond a reasonable doubt. *State v. Winfield*, 23 S.W.3d 279, 283 (Tenn. 2000).

As a Range I offender, the defendant was subject to a sentence of fifteen to twenty-five years for second degree murder, a Class A felony. Tenn. Code Ann. § 40-35-112(a)(1). Following a sentencing hearing, the trial court sentenced the defendant to twenty-five years

as a violent offender[2] in the Tennessee Department of Correction. The trial court applied the following enhancement factors from Tennessee Code Annotated section 40-35-114:

> (1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range . . . ;

> (8) The defendant, before trial or sentencing, has failed to comply with the conditions of a sentence involving release into the community . . . ;

> (9) The defendant possessed or employed a firearm . . . ;

> (16) The defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult . . . [.]

The trial court also found one mitigating factor - the defendant's youth - but found that the enhancement factors outweighed the mitigating factor.

The defendant argues that the trial court did not follow the principles of the sentencing act announced in Tennessee Code Annotated section 40-35-103; however, there is nothing on the record to indicate any support for that argument. The defendant's argument that the trial court overemphasized the defendant's juvenile record, while cast as an argument that the trial court did not properly weigh the enhancement factors, nonetheless has merit because trial court misapplied enhancement factor (1). Factor (1) can only apply to adult criminal conduct, and the trial court applied the factor based on the defendant's juvenile record. *See State v. Jackson*, 60 S.W.3d 738, 742 (Tenn. 2001). The defendant's juvenile record supports the application of factors (8) and (16). *See id.* at 744 (probation violations as a juvenile properly considered for application of factor (8)). The weight given to the enhancement factors is not a proper issue for appellate review. *Carter*, 254 S.W.3d at 344.

An error in the application of enhancement factors will not necessarily result in modification of the sentence if the trial court, in determining the specific sentence, considered the nature and characteristics of the crime, the character and background of the defendant, and the purposes of the Sentencing Act. *See* Tenn. Code Ann. § 40-35-210(b). Despite the trial court's reliance on one inapplicable enhancement factor, the record supports the court's consideration of the remaining three enhancement factors. The record reflects that in determining the specific sentence length, the trial court considered the provisions of

---

[2] Tennessee Code Annotated section 40-35-501(i) provides that "[t]here shall be no release eligibility" for persons who commit the enumerated offenses, including second degree murder.

Tennessee Code Annotated section 40-35-210, as well as the required principles of sentencing.  As such, we affirm the length of the sentences as imposed.

## Conclusion

Based on the foregoing reasons, we affirm the judgment of the trial court.

_____
J.C. McLIN, JUDGE